# IN THE MATTER OF CONTEMPT OF CUMBERLAND COUNTY OYER AND TERMINER, BY JOHN CHEESEMAN.

1. The superior courts of this state, modeled after the English courts of common law, have authority to punish summarily for any words uttered by speech, by writing or by printing, outside of the regular course of litigation, which are designed to bring contempt upon the courts in the exercise of their judicial functions, or to pervert in a pending cause the due administration of justice

2. The jurisdictional facts necessary to legalize a conviction for contempt in the superior courts of law are, first, that matters constituting a contempt should appear to the court to be true; secondly, that the party charged with contempt should have a fair opportunity to confess or deny those matters; thirdly, that he should confess their truth. Outside of these facts, the steps to be taken are matters of practice only, and although a regular course of procedure has been established, yet strict conformity to it may be waived by the person accused.

3. A conviction for contempt may be sustained, although there was no affidavit preliminary to the rule to show cause, no writ of attachment was issued, and no interrogatories were presented.

4. On appeal from a conviction for contempt under the statute of 1884, page 219, this court will not consider the general policy of punishing

such contempts as that of which the appellant is guilty. If, according to the law and the facts, the judgment appealed from is lawful and just, it will be affirmed.

On appeal from an order of the Cumberland Oyer and Terminer, adjudging the appellant, John Cheeseman, guilty of contempt for publishing in his newspaper an article intended to cast discredit upon the grand jury that had indicted him, the sheriff who summoned the jury, and the judge who presided at his trial.

Argued at February Term, 1886, before Justices DEPUE, DIXON and REED.

For the appellant, *Wm. E. Potter.*

This appeal is taken pursuant to the act of the legislature entitled "An act providing for the review of convictions and judgments for contempt of court," approved April 17th, 1884. *Pamph. L.* 1884, *pp.* 219, 220.

The statute is of recent enactment, and novel in its character in respect of the system of jurisprudence in this state. This is the first appeal which has been taken under it.

A brief examination of its provisions, therefore, will be perhaps useful.

The statute is in two sections. The first section consists of a mandatory declaration "that hereafter every summary conviction and judgment by any court inferior in its jurisdiction to the Supreme Court, except an Orphans' Court, for a contempt against its own dignity, peace and good, shall be reviewable both on the law and the facts by the Supreme Court, and every such conviction and judgment by the Orphans' Court shall be reviewable in the same way and manner by the Prerogative Court."

Section 2 of the statute delineates the method of procedure upon the appeal.

It provides "that every conviction and judgment shall, upon the petition prescribed, be by the court wherein such convic-

tion is had immediately certified and sent to the Supreme Court or to the Prerogative Court, as the case may require, to which the same shall be certified and sent, together with the petition of appeal and all proceedings touching the conviction and judgment, and which said court shall be invested with jurisdiction and required to rehear the matter of contempt upon which the conviction was founded, both upon the law and upon the facts, which shall be inquired into and ascertained by depositions or in such other way or manner as the court above shall direct, and it shall be required to give such judgment in the premises as to it shall seem to be lawful and just under all the circumstances of the case, to be enforced in such way and manner as it shall order and direct."

There is an additional provision providing for a *supersedeas* of all further proceedings in the court below pending the appeal.

It is evident that the statute is intended to formulate a method for a trial *de novo* of the subject matter of the contempt both upon the law and the facts. The jurisdiction of the court in this case therefore, upon both of these questions, is substituted for that of the court below, as is also in like manner its discretion.

The provisions of the statute as to inquiry into the facts, have in this case been complied with by the certificate of the court below, which certifies the appeal as here presented " to be a full and complete state of the case."

I. I shall endeavor to discuss here two questions :

1. Had the court below (or has this court), under the laws of this state, jurisdiction under any circumstances, to punish by summary conviction as for a constructive contempt, when the subject matter of the alleged contempt is the publication in a newspaper of an article in respect of the court, sheriff or grand jury, critical or contemptuous in matter and style, which publication concerns a judicial proceeding at the time thereof pending and undetermined?

2. Conceding such jurisdiction under some circumstances, are the proceedings of the court appealed from, upon the law

and the facts here presented, such as should be reversed upon this appeal?

The first question involves an inquiry into the power of the courts to hear and determine, and therefore to punish a constructive contempt of the character described; and as it concerns the liberties of the people, and is thus a question of civil liberty of the highest nature, I feel confident that this court will give it the full and careful consideration which its importance demands. I regard it, not as the court below viewed it, nor as the English courts of common law since the beginning of this century have treated it, as a legal question only, but as of much higher import, a politico-legal question.

What, therefore, is the nature, form, method and extent of the jurisdiction of our courts to summarily convict and punish the citizen as for a contempt?

In countries possessed of Anglo-Saxon civil liberty it is the sole surviving remnant of despotic power. All other powers of despotism having their origin in brute force, in the progress of our race and through our written constitutions and laws framed upon them, have been swept away. Being despotic, this power radically and necessarily is hostile to, and conflicts with, all the great safeguards of our constitutional freedom. It dispenses with a grand jury. It convicts without the intervention of a petit jury. It violates the fundamental principle that no judge shall try a cause in which he has a personal interest. It makes the judge, who is the injured and therefore the offended party, at once the person who makes the accusation, defines the crime, furnishes the evidence, decides as to its sufficiency, convicts, and fixes the term and degree of punishment, which is without limit, except in his own discretion, and may extend to entire confiscation of property and imprisonment for life.

Where the jurisdiction exists, its exercise at the common law is not subject to revision or review, except in mere matters of form. *Rhinehart* v. *Lance*, 14 *Vroom* 311, 312; *In re Crawford*, 13 *Q. B.* 613; *First Congregational Church* v. *Muscatine*, 2 *Clark* 69; *Rex* v. *Clement*, 4 *B. & Ald.* 218.

It is, therefore, an absolute as well as a despotic power, which holds within its circle the property and personal liberty of every citizen.

The courts themselves, in this country, view it with disfavor.  This court, speaking through Mr. Justice Depue, in Rhinehart *v.* Lance, above cited, says :  " The power to commit at discretion and for a discretionary term of imprisonment is a transcendant prerogative power.  At best it is an arbitrary power and liable to great abuses."

The Supreme Court of California declares it to be " arbitrary in its nature."  *Batchelder* v. *Moore, 42 Cal.* 412.

Other courts declare it to be " an exception to the provisions of the constitution of the United States, and not to be extended in the least degree beyond the limits imposed by statute."  *Rutherford* v. *Holmes,* 6 *Hun* 317 ; *Bergh's Case,* 16 *Abb. Pr.* 266 ; *People* v. *Jacobs,* 66 *N. Y.* 8.

Judge Ludlow, of Pennsylvania, remarks that " history teaches us that the arbitrary conduct of judges protected from just criticism by arbitrary laws, and acting under the control and sanction of the executive power or at the command of the hereditary head of the government, has inflicted serious damage to the cause of liberty."  *Grand Jury* v. *Public Press,* 4 *Brewst.* 313.

The Supreme Court of Illinois says : " It is at best an arbitrary power and should only be exercised on the preservative and not the vindictive principle.  It is not a jewel of the court to be admired and prized, but a rod rather, and most potent when rarely used."

The views thus set forth as to judicial power in respect of contempt to us at this day are axiomatic and need no arguments to enforce them.  They lead inevitably to the conclusion that none but the most cogent reasons will justify the existence of such a power, under any circumstances, among a free people.

The English courts have undertaken to sustain the power upon two grounds :

First. That the superior courts in that realm are the suc-

cessors of the court held *in aula regis* where originally the king sat in person to administer justice, so that an interference with or insult to the court or its officers was, in fact, an insult to the royal person of the king himself, and that, as by legal fiction he is still potentially present in his superior courts, the ancient reason still remains.

This is the reason given in *Almon's Case, Wilmot's Opinions* 243, prepared in the last century, and by Chief Justice Cockburn in *Rex* v. *Lefroy*, 8 *Q. B.* 134, in 1873.

But it is clear that this reason is without force here, for there is no personal sovereignty either actually or potentially present in our courts.

The second reason given, and the only one which can here justify the existence of the despotic judicial power in respect of contempts is, when reduced to its primal elements, its absolute necessity to preserve the life of the courts. In other words it consists in the right of self-defence,, without which all human life and action must succumb when assailed.

The same reason, and no other, which justifies one citizen to slay another, or a municipality to blow up a burning building, or hostile states to destroy thousands of lives upon a field of battle, the *ultima ratio regum*—the supreme effort of sovereignty for its life, justifies this form of judicial power. A court with its various departments and officers is like a piece of machinery which, if tangibly, actually and materially interfered with, must stop ; and it must have the power, in order to exist, to punish actual obstructions to its duties and disobedience of its process and decrees.

It is only by blending these two radically different classes of acts, those which physically and materially interfere with the courts and those which by their essence cannot otherwise than intangibly and morally interfere with them, and by assuming that no distinction can be logically drawn between such methods of interference, that those who have written upon this subject can frame an argument. The great storehouse from which the arguments of those favorable to the expansion of the judicial power have been drawn, is the

opinion of Chief Justice Wilmot, of the Common Pleas, in Almon's case, above cited; and there has been no improvement upon it either in matter or style.

Without pursuing this line of inquiry further, I shall assume, for the purposes of this argument, that the power to punish in respect of contempt by summary conviction, cannot be justified unless its existence is actually necessary to conserve the life and operations of our courts.   And to narrow the line of inquiry and apply it to the case at bar, my first subordinate proposition is : That in respect of constructive contempts by publication in a newspaper there is no actual necessity, nor even any expediency, for the existence of this absolute and despotic judicial power.

This position I shall sustain, not by abstract reasoning, which is at best a feeble weapon, but by pointing out the condition of the law in this country upon this subject.

The statement which I now make is not found in any text-book or adjudicated case, but is the result of my own personal examination.   It is that in thirty-three of the thirty-eight states of this country, the power of the courts to summarily convict and punish as for contempt in respect of a publication, has been, for periods ranging from 1667 until the present time, by positive enactment, either totally forbidden or defined and limited or rendered subject to review.

The courts of the United States have been in like manner forbidden the power for fifty-five years.   By the act of congress of March 2d, 1831, it is provided that " the power of the courts of the United States to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of said courts in their official transactions, and the disobedience or resistance by any such officers, or by any party, juror, witness, or other person, to any lawful writ, process, order, rule, decree, or command of the said courts."

This act of congress grew out of the arbitrary action of Judge Peck in respect of a contempt similar to the one at bar.

He was impeached and barely escaped conviction, but was the agent to put it out of the power of any other United States judge to repeat his offence. I have not been able to find a copy of Peck's trial, and state the facts only as I have found them referred to in some of the cases.

The United States Supreme Court has been frequently spoken of as the most august tribunal in the world, and it and the other courts of the United States have the power to pass upon the constitutionality of acts of congress; by their construction of the constitution, they have the power to mold, and in fact have molded, the government of the United States. They consider matters of revenue, commerce, and great questions of peace and war, involving the rights, liberties and destinies of more than fifty million freemen. Dealing with the gravest politico-legal questions, they have been time and again bitterly assailed in the public prints, and as well the personal integrity of their judges, as their official acts, have been unsparingly attacked; insomuch that their decisions have been not only reversed by popular opinion, but rendered forever nugatory by change in the organic law. If, as is argued by Chief Justice Wilmot in Almon's case, above cited, and those who follow his line of reasoning, the power to punish publications summarily as for contempt is essential to the dignity and influence of the courts, without which they will be destroyed, it would seem that the courts of the United States must possess it or fail in their high office. Yet, as we have seen, if it was ever legally inherent in them, they have not possessed it more than half a century, the greater part of their existence. And in like manner if the courts ever possessed the power to summarily punish for contempt contended for by Chief Justice Wilmot and his followers, they have lost it in thirty-three of the thirty-eight states of the Union; some of them imperial in population and resources, and in the aggregate, to use Webster's brilliant metaphor, in his celebrated Hulsemann letter, spread over a region one of the most fertile on the globe, and of an extent in comparison with which the pos-

sessions and area of the State of New Jersey are but as a patch on the earth's surface.

In view of these facts, what becomes of the assertion, for it is really nothing more, that the power to punish publications as contempts is essential to the courts?

II. I pass to the second subordinate proposition of my argument as I have arranged it, but which is really decisive, and contend:

That the courts of common law in New Jersey are without jurisdiction to summarily convict and punish any person as for contempt in respect of words published in a newspaper.

Aside from the reasoning heretofore made, I support this contention upon two grounds.

First. That the doctrine of constructive contempt in respect of publications is of recent introduction, and was not part of the common law brought with them by our ancestors to this country; nor was it a part of the common law at the time of the beginning of the American Revolution.

Second. Whatever may be the truth of the above contention, I affirm that this doctrine is not, and never has been, the law of this state, in the courts of common law.

It was decided by this court, in *Rhinehart* v. *Lance*, 14 *Vroom* 311, 320, that the power to commit for contempt "is not a necessary incident of a court of justice, and therefore is not granted by implication. It can only be derived from the common law or by a legislative grant of such a power;" and this conclusion needs no argument to support it.

There is no statute upon the subject in this state, and therefore, if the power exists here, it must be an inheritance from the common law. The term "common law" as here used, it is well understood, means the common law of England as it existed at the time of our severance from allegiance to the British crown; and if in any essential respect the law of England since that period has been changed, it may be construed to be the common law of England, but it is not, in so far as it has been changed, the common law of New Jersey, which still remains as the law of England stood before such

change. I affirm that there is no reported case of the exercise of jurisdiction by a court of common law in the matter of a constructive contempt in respect of a publication prior to the American Revolution.

The art of printing was invented in A. D. 1423, and for a period of more than three centuries and a half thereafter, such jurisdiction was not even so much as hinted at in the decision of any common law court, so far as the reports disclose. Even in the stormy times near the beginning of the reign of George III., when the trenchant pens of Junius and other pamphleteers mercilessly assailed the whole body of the government, from the king to the meanest tide-waiter of the custom-house, and in particular the official acts and private reputation of Lord Mansfield, then Chief Justice, no trace of the exercise of this jurisdiction is to be found. The earliest case to which any reference is made in the books, is that of Almon, in Wilmot's opinions, above cited. This opinion was prepared, as is said, in 1765, but was, in fact, never delivered, for the proceedings were abandoned by the prosecution, not as is conjectured in a note to the opinion, because of the resignation of the then Attorney-General, Sir Fletcher Norton, but more probably because neither the prosecution nor the opinion was in accordance with the law of England as it then stood. Not only was there never any judgment in the cause, but the opinion was never even printed until 1802.

See original edition Wilmot's Opinions, printed London, 1802, adv. and note to *Almon's Case, p.* 243, in State Library.

The first instance in which an order was ever made in England to prevent the publication of proceedings pending a trial was on the impeachment of Lord Melville in 1806.

Stated by Denman and Platt, *arguendo*, in *King* v. *Clement,* 4 *B. & Ald.* 218, 245. I have not been able to find, in any reported case, any claim of this jurisdiction by any English common law court before that date. Indeed, the jurisdiction seems to have been exercised in this country before it was in England, for *Respublica* v. *Oswald,* 1 *Dall.* 319, was adju-

dicated in 1788, and although elaborately argued, no authority for the jurisdiction is cited except the Commentaries of Blackstone.

On the contrary, the only common law precedents upon the subject prior to 1800, are decidedly against the exercise of this jurisdiction by the English courts. *Rex* v. *Gray,* 1 *Burr.* 610, decided in 1758.

In this case, which was the matter of a libelous publication relative to a question at issue, and in which Lord Mansfield presided, an information was ordered to be filed by the court ; an entirely different proceeding from that of contempt, and in a similar case that of *Rex* v. *Jolliffe,* 4 *T. R.* 285.

An information was also directed to be filed in this case by Chief Justice Kenyon, who in terms expressly states that at that time there was but one precedent in respect of the subject matter of such a publication, namely, Rex *v.* Gray, above cited.

These two cases were cited as against the power of the court in *Hollingsworth* v. *Duane, Wall. C. C.* 77 ; and Judge Griffith, who presided in that case, deemed them of such force, that in a foot-note signed with his name, and printed with the case, he states that the reason why the court ordered informations to be filed in these two cases, and did not proceed summarily as for contempt, was that the Assizes had no jurisdiction in contempt.

But Judge Griffith, although a jurist and lawyer of ability and acquirements, was clearly in error in this statement, for the English authorities are distinctly to the contrary. They hold that "a Court of Assize is a superior court, and consequently in a warrant of commitment by a judge of Assize for contempt, the adjudication for contempt may be general, and the particular circumstances need not be set out." *Re Fernandez,* 6 *Hurlst. & N.* 717 ; *Same Principle and Same Case,* 10 *C. B. (N. S.)* 3.

Upon this subject, prior to 1800, save in the two precedents noted, as Buller, J., said, in *Le Caux* v. *Eden,* 13 *How. St. Tr.*

1269, speaking of another matter, there was "a universal silence in Westminster Hall."

Since the beginning of this century, the doctrine of constructive contempt has been greatly expanded in England, and it is beyond doubt, in that country, now fully established in respect of publications, thus making a radical change from the law as it existed before our Revolution.

I have not seen it suggested elsewhere, but my own examination has convinced me that this change in the law of England in the respect noted, was due to three principal causes.

First. By the influence of the Commentaries of Blackstone, the last volume of which was published in 1769. On pages 285, 286 of the fourth volume of that work, the author has a single clause on the subject of contempts by publication : " By speaking or writing contemptuously of the court or judges acting in their judicial capacity, by printing false accounts (or even true ones without proper permission) of causes then depending in judgment." He gives no authority for this doctrine, but it is evidently borrowed from 2 *Hawk. P. C.*, c. 22, § 36, where it is also stated without citation of authority.

*Second.* By the elaborate argument of Chief Justice Wilmot in Almon's case, above cited, first published in 1802.

But as the text of law writers and the arguments of a learned jurist, however forcible, could hardly be sufficient to change the law of England, in a matter imperiling civil liberty, the controlling reason in my judgment was—

Third. The change in the law of England in respect of the issues involved in the trial by jury of an indictment for libel.

It will be remembered that in the trial of the Dean of St. Asaph for criminal libel, in 1784, the jury returned a verdict of "guilty of publishing only," which, after some difficulty with Mr. Justice Buller, Mr. Erskine succeeded in having recorded. Upon the coming in of a rule to show cause, Mr. Erskine, in an argument which has been spoken of by high authority as " beyond all comparison the most perfect union

of argument and eloquence ever exhibited in Westminster Hall," contended that the verdict found was tantamount to a verdict of acquittal.   But the court, in discharging the rule, held with Justice Buller, that the sole question upon which the jury could pass, was that of publication, and that it remained for the court to decide whether or not the publication was a libel; and this decision was without doubt in accordance with respectable precedent.  Such was the influence, however, of popular opinion, that with the aid of Lord Camden, although strenuously opposed by Lords Thurlow, Kenyon, Bathurst and all the judges of the House of Lords, a bill was finally passed by parliament, June 1st, 1792, declaring the right of the jury " to give their verdict in the whole matter at once."   This law is the prototype of the provision of our own constitution that " in all prosecutions or indictments for libel  *  *  *  the jury shall have the right to determine the law and the fact."

The pertinence of this historical review may be easily seen. Before the act of parliament of 1792, prosecutions for libelous publications upon the court or judges were by indictment, upon the trial of which the jury passed only upon the question of publication, and the judges retained in their own hands the determination of the essence of the crime, namely, its libelous quality.   The prosecution, while retaining a color of ordinary and regular legal inquiry, was in effect as arbitrary, and almost as summary, as proceedings for contempt.   But after the intervention of the act of 1792, prosecutions by indictment for libel ceased to be certain in their results, and the courts of England, taking advantage of the undefined power in respect of contempt, and fortified by Blackstone's opinion and Wilmot's argument, began to expand the law of contempt so as to reach publications.

This change in the law of England, however, can have no force in this state, for our common law upon the subject in hand is the common law of England as it was before the change.

Second.  The second branch of my argument in support of

the position now in discussion, is that whatever may be the force and truth of the foregoing contention, the doctrine of constructive contempt in respect of publications, is not and never has been the law of this state in the courts of common law.  No court of common law in this state, from its earliest history, has ever summarily convicted and punished a citizen as for contempt in respect of a publication.  This is the first case in which it has ever been attempted, so far as any precedents disclose, and so far as I have any information.

The following are all the reported cases in the courts of common law in this state, of attachments as for contempts, with a statement of the causes of the proceedings :

For disobedience or resistance by officers, parties, jurors, witnesses, or other persons, to writs, processes, rules, decrees, &c.: *State* v. *Hunt, Coxe* 287 ; *State* v. *Lee, Id.* 394 ; *State* v. *Trumbull,* 1 *South.* 139 ; *State* v. *Raborg,* 2 *Id.* 546 ; *Flommerfelt* v. *Zellers,* 2 *Halst.* 31 ;  *Crane* v. *Sayre,* 1 *Halst.* 111 ; *Gilliland* v. *Rappleyea,* 3 *Green* 138 ; *McClure* v. *Gulick,* 2 *Harr.* 340 ; *State* v. *Gulick,* 2 *Id.* 435 ; *Hendrickson* v. *Hendrickson,* 3 *Id.* 366 ; *Strugle* v. *Haine,* 1 *Zab.* 245 ; *State* v. *Ackerson,* 1 *Dutcher* 209 ; *State* v. *Elkinton,* 1 *Vroom* 335 ; *Smith* ads. *State,* 2 *Vroom* 216 ; *Wandling* v. *Thompson,* 12 *Vroom* 142 ; *McQuade* v. *Emmons,* 9 *Id.* 397 ; *Cox* v. *Passaic Common Pleas,* 16 *Id.* 328.  For attempt to communicate with jury: *State* v. *Doty,* 3 *Vroom* 403.

That inferior courts and justices of the peace have no jurisdiction in contempt for any cause whatever.  *Matter of Kerrigan,* 4 *Vroom* 344 ; *Rhinehart* v. *Lance,* 14 *Id.* 311.

In none of the above-cited cases is there any reference to the jurisdiction of the courts in respect of contempt by publication, except in *State* v. *Doty,* 3 *Vroom* 403.

That case was a proceeding against a person, not a party nor interested in the suit, for endeavoring to arrange a signal with one of the jurymen, to inform him how the jury stood with regard to their verdict.  Chief Justice Beasley, in delivering the opinion of the court, says : " A court would fail of necessity to accomplish the end of its institution if it could

not maintain order, and enforce obedience to its precepts. The authority is derived from necessity, and the authority ceases only where such necessity ceases."

This proposition has my full assent, for it is the very principle which I have heretofore stated as the only one upon which the contempt power in any case can be defended. But in giving illustration of the use of this power the Chief Justice uses the following language : " Thus, it is a contempt of court in all persons who resist the execution of its writs, or treat contumeliously its officers in the lawful discharge of their duties ; so to solicit a witness to disobey a subpœna, to offer insult to a judge for his conduct while on the bench, or to publish anything relating to a cause pending in court, and which has a tendency to prejudice the public mind upon the subject, or which contains improper strictures on the conduct of counsel, witnesses or parties."

It is manifest, I think, that in giving these illustrations, the Chief Justice had in mind, but one *differentia* to classify contempts, namely, the inquiry whether they are committed in the face of the court or beyond its precincts and ken ; and that he had overlooked the important division of contempts heretofore noted, namely, into those contempts which actually and materially obstruct the operations of the courts, and those which only morally and intangibly interfere with them. It would seem to be easy indeed to bring the case under review within the limits of the former division, for the complete seclusion of the jury from communication with other persons is, by the common law, of the essence of a jury trial, is guarded by the constable's oath, and is therefore a standing, and uniform, and inflexible rule of the court ; and any arrangement to communicate with the jury is potentially and *pro tanto* disobedience or resistance to a lawful rule, order or command of the court. It falls easily, therefore, within the first division of contempts heretofore noted, and within all the illustrations exhibited by the Chief Justice, save that in respect of publications ; and his remarks as to these may with propriety be considered as a *dictum* only ; and while it is to

be treated with respect as the opinion of a jurist of experience, cannot have the force of a precedent, especially in a cause involving personal liberty.

But assuming that the Chief Justice had in mind what has been suggested as the true criterion of jurisdiction in contempt, and that his illustration as to publications was in point in the case discussed, and therefore not a *dictum* only, but an adjudication, let us examine upon what authority it rests. He cites but five authorities. *Rex* v. *Clement,* 4 *B. & Ald.* 218; *People* v. *Few,* 2 *Johns.* 290; *Respublica* v. *Oswald,* 1 *Dall.* 319; *Commonwealth* v. *Dandridge,* 2 *Va. Cas.* 408; 4 *Bl. Com.* 258 (error for 285). I will examine these in the order named.

The first case cited, Rex *v.* Clement, was in 1821, and therefore has no pertinency here, in view of my argument that the power to punish for contempt in respect of publication did not exist at common law before the American Revolution, and the admission that it has become firmly established in England since that time. In addition, in that case the proceedings were for the disobedience of an order of the court previously made, expressly forbidding any publication of the proceedings of a trial for high treason, pending the trial. The case itself, even if it were of older date, involved the question whether such publication was a disobedience to a lawful order of the court, obviously a very different question from the one under discussion here.

In *People* v. *Few,* 2 *Johns.,* decided in 1807, the attachment was discharged. No common law precedent was cited in support of it.

In *Respublica* v. *Oswald,* 1 *Dall.,* decided in 1788, there was a conviction. But no authority was cited by either counsel or court, except the Commentaries of Blackstone. The action of the court in this case, sustaining the power, led to proceedings looking to the impeachment of the judges of the Supreme Court by the general assembly of the state. The resolution to that end was defeated by a small majority, apparently because of the strenuous efforts of Mr. Lewis, of

·counsel for the prosecution in the case cited, who was a member of the house.   See note to the case.

*Commonwealth* v. *Dandridge,* 2 *Va. Cas.*, was in 1824.   In that case the judge holding the court was charged with corruption and cowardice while he was upon the steps of the ·court-house, after the hour of opening court had arrived, and when he was about to open court.   The offence was, in fact, committed in the face of the court.   The leading opinion does not put the conviction on that ground, but discusses generally the law of contempt.   The other opinions, however, refer to that fact, and the opinion of one of the judges is carefully worded to guard against the expansion of the power.

No precedent is cited, and on page 437 of the report, it is .substantially admitted that no reported authority can be found for a constructive contempt proceeding of like character, except the case of the *Printer of the Champion et al.,* 2 *Atkyns* 469, which was in the Court of Chancery and not at common law, and *King* v. *Barber,* 1 *Str.* 444, in which there was no ·conviction, and the proceedings were abandoned.   See note to last-named case.

It thus clearly appears that the illustration in respect of ·contempt by publication, given by the Chief Justice, rests for its sole authority upon the remark in 4 *Bl. Com.;* and for this remark, as we have seen, that distinguished author cites no precedent.   State *v.* Doty, therefore, cannot be regarded as an adjudication to bind this court to assume despotic power ·over the property and liberty of the citizen.

In the determination of the question of the existence in our ·courts of the power to punish as for contempts, in respect of publications, the non-exercise of the power must have much weight.

In respect of executive, legislative or judicial power, especially when personal liberty is involved, the argument of non-user is always potent.

It was with this argument, as used by Mr. Burke in his speech upon American taxation, that the colonists met and ·overthrew what Lord Campbell designates as the " unanswer-

able argument" of Lord Mansfield in support of the power of parliament to tax the colonies, declared in the preamble to the act repealing the stamp act.

. "Leave the Americans," says Mr. Burke, "as they anciently stood, and these distinctions, born of our unhappy contest, will die along with it. They and we, and their and our ancestors, have been happy under that system. Let the memory of all actions, in contradiction to that good old mode,. on both sides, be extinguished forever. Be content to bind America by laws of trade : you have always done it. Do not burden them with taxes : you were not used to do so from the beginning. Let this be your reason for not taxing. These are the arguments of states and kingdoms."

And this court has applied this argument in determining important cases.

In *State* v. *Kelsey,* 15 *Vroom* 1, 18, it permitted usage under a statute to give its terms a meaning which the court would not have given it without such usage ; and that in contravention of a principle which the same court, in the same opinion, designates as " a salutary one, and indeed indispensable for the protection of the public rights and interests, and as firmly rooted in the judicial decisions of this state as in those of any other jurisdiction."

And in the case of *Matter of Drainage along the Pequest River,* 11 *Vroom* 175, 179, this court held that while the legislature has no inherent or constitutional power to appoint methods for the drainage of meadows, yet the right " has been so frequently exercised and acknowledged, that it has become a part of the local common law."

It is true that these cases contain the argument by inversion, but it is none the less the same argument.

How much more forcible does it become when applied to test a despotic power, which, if it ever existed, has never been used, and, already dust and ashes, has been buried so long that the very forms and method of procedure are unfamiliar to the court which attempts to employ it.

III. My last general proposition is : That conceding, for

purposes of argument, the jurisdiction in respect of publication assumed by the court below, the proceedings appealed from upon the law and the facts here presented, are so defective that they should be reversed.

1. The court had no jurisdiction in respect of a publication touching a grand jury whose functions had previously determined, nor in respect of a publication touching a sheriff who was previously *functus officio*.

There is no precedent in respect of either case.

By the state of the case, page 4, it appears that the publication treating of the grand jury and sheriff, was January 30th, 1885. The grand jury spoken of was summoned and acted at the January Term, 1884, of the Cumberland Oyer and Terminer.

Its functions ended with that term, and it had no legal existence, as a part of the court or otherwise, after the expiration of that term.

The court will take judicial notice of the fact that the term of office of the sheriff spoken of in the publication, expired in November, 1884, so that he also, at the time of the publication, was *functus officio*, and was no longer an officer of the court in any proper sense.

The proceedings and conviction therefore, so far as they concern the publication touching the grand jury and sheriff, are clearly erroneous.

2. The court below was without jurisdiction, and its proceedings, conviction and judgment are void, because no affidavit was filed as a condition precedent to its action.

Constructive contempts must be brought before the court by affidavits of persons who witnessed them, and thereupon a rule is made upon the offender to show cause why an attachment should not issue against him. 4 *Bl. Com.* 287; 2 *Hawk. P. C.* 222; 1 *Tidd Pr.* (3d *Am. ed.*) 88; 6 *Dane Abr.*, ch. 193, *p.* 528; 7 *Id.*, ch. 220, art. 5, *pp.* 307, 308; *Commonwealth* v. *Dandridge*, 2 *Va. Cas.* 408; *State* v. *Mather*, 37 *N. H.* 450; *Crow* v. *State*, 24 *Tex.* 12; *Rapalje on Contempt, pp.* 121, 122, § 93.

I have found no reported case in the United States where a rule has been granted in a matter of constructive contempt, without an affidavit previously filed.

And this condition precedent is of the essence of the jurisdiction in constructive contempt, and not a method of procedure merely.

For while the courts have a general jurisdiction in respect of contempts committed in the face of the court, where the proceeding is entirely summary, and no proof other than the senses of the court is required, yet, in respect of constructive contempt, they have only a particular jurisdiction, which cannot be called into action unless *prima facie* evidence of the commission of the offence is formally presented to the court.

In *Batchelder* v. *Moore*, 42 *Cal.* 413, 414, the Supreme Court of California says: "The power of a court to commit for contempt, though undoubted, is in its nature arbitrary, and its exercise is not to be upheld except under the circumstances and in the manner prescribed by law. . It is essential to the validity of proceedings in contempt, subjecting a party to fine and imprisonment, that they show a case in point of jurisdiction within the provisions of the law by which such proceedings are authorized, for mere presumptions and intendments are not to be indulged in their support. The statute of this state regulating contempts and their punishment, provides that when the alleged contempt is not committed in the presence of the court, an affidavit of the facts constituting the contempt shall be presented. If there be no affidavit, there is nothing to set the power of the court in motion. And there is no distinction between the utter absence of an affidavit and the presentation of one which is defective in substance, in stating the facts constituting the alleged contempts."

It is true that the court, in the foregoing opinion, is discussing the statute of California; but that statute in requiring an affidavit in constructive contempt is merely affirmative of the practice at common law, and the reasoning of the court applies with equal force to proceedings under the latter practice as to

those under its own code.   See, also, *McConnell* v. *State*, 46 *Ind.* 298.

That no affidavit or other *prima facie* proof even, preceded the issue of the rule by the court below in this case, conclusively appears by the state of the case, which is certified by the court itself to be "full and complete."

The case states a representation to the court that the defendant is an editor of a certain newspaper, and that at a certain date he published therein articles, which are quoted. At the end of the rule to show cause, "it is ordered that the prosecutor of the pleas present to this court the evidence upon which this rule is issued, upon the return day of this rule."

As no such evidence appears in the state of the case, the conclusion is absolute that none such was presented, either at the return of or upon the issue of the rule.   Nor will the recital by the court below, of a representation made to it, supply either to that court or to this court, the absence of a representation legally made, namely, by an affidavit.   The case, therefore stood, before the court below, and it stands here, upon the issue of a rule to show cause, reciting material facts essential to jurisdiction, of which there was no legal *prima facie* evidence.

Nor, in view of what has already been stated, as to the presence of an affidavit being essential to the jurisdiction of the court below, and here, in proceedings for constructive contempt, does the appearance in person of the defendant upon the return day of the rule, and his filing an affidavit in denial of any intention to commit a contempt, serve to give the court jurisdiction.   An appearance may cure a defect in procedure or waive a privilege, but it cannot create jurisdiction where it does not exist.   No less an authority than the Supreme Court of the United States has said : " The tendency of modern decisions everywhere is to the doctrine that the jurisdiction of a court or other tribunal, to render a judgment affecting individual rights, is always open to inquiry when

the judgment is relied on in any other proceeding." *Kilbourn* v. *Thompson*, 13 *Otto* 168, 198.

In appearing below, the defendant was under the strongest duress, in a proceeding novel as well to the court as to himself. He had the right to suppose, and as his affidavit shows did suppose, that his denial of intentional contempt would end the proceedings. It would be a strained construction of the law to hold that his appearance below without a formal protest as to jurisdiction, would conclude him here in a new trial covering matters of discretion as well of law as of fact. fact.

3. I press as arguments addressed to the discretion of the court, two considerations :

First. That the article in respect of the *animus* of the president judge towards the defendant, upon the trial upon the indictment for assault and battery, is shown, by the state of the case, not to have originated with the defendant, but to have been simply copied into his newspaper from another, to which it was credited, without comment ; and that the sole object of the defendant in publishing it was an honest endeavor to show the community of his neighborhood what views were entertained on the subject by outside parties, and not with any purpose to injuriously prejudice the public mind against the court below. As to the facts stated in it, the affidavit of the defendant, under the cases, is conclusive ; as to the intention stated, I admit that it is not necessarily and legally conclusive. But the point now is whether this court, in its discretion, will punish the mere reproducer of a publication. If that ground is taken, and every editor is obliged to closely scrutinize the matter clipped from other newspapers before he can print it in his own, then the long-established freedom of the press will be largely circumscribed.

Second. The laches of the court below is a forcible argument against the affirmation of its conviction by this court. The publications complained of were made January 30th, 1885. No rule was issued until May 11th, 1885. It was made returnable on the 24th day of July, more than two

months thereafter. The affidavit of the defendant was filed upon that day, and no further proceedings were taken by the court below until January 13th, 1886, when the defendant was convicted.

Arbitrary and summary powers must be swift and instant in their execution, or the reason for their possession and exercise fails.

IV. In view of what has been heretofore stated, I urge further, as worthy of the gravest consideration, that the exercise of the jurisdiction of proceedings as for contempt in respect of publications, is against public policy.

The history of the country shows that almost every instance of its exercise has run counter to popular opinion.

In conclusion, I urge that upon all the reasons stated, the conviction and judgment of the court below should be reversed and the appellant here acquitted.

The opinion of the court was delivered by

DIXON, J.   The appellant had been indicted at the January Term, 1884, of the Cumberland county Oyer and Terminer, and at the January Term, 1885, had been tried on the indictment, but the jury disagreed.   On January 30th, 1885, he published in his newspaper an article intended to cast discredit upon the members of the grand jury that had indicted him, upon the sheriff who had summoned the jury, and upon the judge who had presided at his trial, and who, in the regular course of official duty, would preside when he should be again tried.   For this article the appellant was adjudged by said court to be guilty of contempt and to be fined $100, whereupon he appealed to this court.

The appellant's counsel insists that such a publication is not a contempt of court in this state.   Fully admitting that it would be regarded as a contempt in England according to the views of the present day, he contends that such views had their origin subsequent to the American Revolution, and are therefore not to be considered as indicating our common law. That this position is, however, false will appear from a refer-

ence to many declarations and decisions made before our separation from the mother country, by writers and courts to whom we are wont to look for authoritative evidence of the common law.

As early as the time of Lord Clarendon, the first Chancellor after the Restoration, prosecutions for contempt by abusive words uttered out of court had become so frequent, that a special rule of court was adopted for their regulation. *Com. Dig., tit. "Chancery," D.* 1, *note h.*

In 1709, a defendant, on being served with a rule of the Queen's Bench to show cause why an information should not be filed against him, spoke of the rule in a contemptuous manner. The court sent an attachment for contempt against him, without even a rule that he show cause why it should not be issued. *Anon.,* 1 *Salk.* 84.

In 1720, the same practice was pursued in the King's Bench against one Jones, who had treated the process of the court contemptuously, (*Rex* v. *Jones, Str.* 185); again in 1724, against one who had used contemptuous words on the delivery to him of a declaration in ejectment (*Rex* v. *Unitt, Str.* 567); and again in 1737, under circumstances like those of *Rex* v. *Jones, supra. North* v. *Wiggins, Str.* 1068.

In 1720, Pool was committed for contempt of the Court of Chancery, in having put an advertisement in the "Daily Courant," offering a reward of £100 for legal proof of a certain marriage then in question before the court; Lord Chancellor Parker saying: "This tends to the suborning of witnesses, * * * and is a contempt of court, *being a means of preventing justice in a cause now depending,* * * * and as the court may, so in justice it ought to punish this proceeding." *Pool* v. *Sacheverel,* 1 *P. Wms.* 675. It was this jurist whom Hawkins, in the preface to his second book on the Pleas of the Crown, described as possessing the most perfect skill and experience in the common law.

About 1724, Dr. Colbatch was attached for contempt in the King's Bench, for having written in his *Jus Academicum,* in allusion to the court's granting writs of *mandamus* and pro-

hibition against the University of Cambridge, " that they who intend to subvert the laws and liberties of any nation commonly begin with the privileges and immunities of the universities." Chief Justice Pratt sentenced him to be imprisoned, fined, and bound over to good behavior. 3 *Campb. Lives of Ch. Just.* 70.

Shortly afterwards, Dr. Colbatch's adversary, Dr. Bentley, complained to the King's Bench that Cambridge had taken away his degree without hearing him, because, on being served with process to appear in an action of debt before the Vice Chancellor of the university, he had said contemptuously to the beadle, that the process was illegal and he would not obey it, that the Vice Chancellor was not his judge, and was acting foolishly. The same Chief Justice, in reversing the action of the university, remarked : " If Dr. Bentley had said as much of our process, we would have laid him by the heels for it ; he is not to arraign the justice of the proceedings out of court, before an officer who has no power to examine it." *Rex* v. *University of Cambridge, Str.* 557, 565.

In 1744, the King's Bench granted a rule for an attachment against one Redman, for threatening Murphy (the prosecutor in an information for a misdemeanor) with danger of his life, and saying he would be hanged. *Rex* v. *Carroll,* 1 *Wils.* 75.

About the same time, Lord Hardwicke committed two printers to prison for contempt of court in printing reflections on the parties and witnesses in a cause pending in chancery, saying " there is nothing of more pernicious consequence, than to prejudice the minds of the public against persons concerned as parties in causes, before the cause is finally heard.   *   *   * One kind of contempt is scandalizing the court itself. There may be likewise a contempt of this court in abusing parties who are concerned in causes here. There may be also a contempt of this court in prejudicing mankind against persons before the cause is heard." *Roach* v. *Garvin,* 2 *Atk.* 469.

About 1720, Hawkins' Pleas of the Crown was issued. In it the learned sergeant enumerates among the most remarkable instances of contempts for which any person is punish-

able, " contemptuous words or writings concerning the court," of which kind, he says, it seems endless to put any instances, since they are generally so obvious to common understanding. 2 *Hawk. P. C.*, ch. 22, §§ 33, 36.

Before 1740, Comyn's Digest was published, and it is therein asserted that attachment will lie for abusive usage or words of the process, or officers of the court. *Com. Dig., tit. " Chancery," D.* 3.

Between 1740 and 1750, Viner's Abridgment appeared, which, under the title " Contempt," states : " Sometimes a contempt arises in using words imputing scorn, reproach or diminution of the court."

And finally, Blackstone, in his fourth book (page 283), published within a decade before the American Revolution, mentions among the principal instances of contempts of court punishable summarily by attachment, those committed away from the presence of the court, by parties writing or speaking contemptuously of the court or judges acting in their judicial capacity.

In this array of authorities, running through the two generations next preceding the " Declaration of Independence," is not to be forgotten Chief Justice Wilmot's opinion in Almon's case, written in 1765, vindicating the power to punish this species of contempt as one inherent in the superior courts according to the settled principles of the common law. *Wilmot's Opinion* 243.

These citations may be fitly closed by the testimony of Lord Erskine, uttered indeed thirty years after New Jersey had ceased to be a colony of Great Britain, but toward the end of a life made illustrious by such devotion to the " liberty of the press " as not even its extreme advocates will question ; he said, in *Ex parte Jones*, 13 *Ves.* 237 (1806): " It never has been, or can be denied, that a publication, not only with an obvious tendency, but with the design to obstruct the ordinary course of justice, is a very high contempt."

It thus appears, beyond dispute I think, that the superior ~~courts~~ of England, before the formation of the United States,

had legal power to punish summarily for any words uttered by speech, by writing or by printing, outside of the regular course of litigation, which were designed to bring contempt upon the courts in the exercise of their judicial functions, or to pervert in a pending cause the due administration of justice.

The appellant's counsel contends, in the next place, that this power did not pass to the courts of New Jersey.

So far as our courts are modeled after English courts of common law, a presumption arises that they possess all the powers which their prototypes lawfully exercised, and the burden of establishing the contrary rests upon him who asserts it. Counsel endeavors to maintain his position upon the ground that the power now denied is contrary to the spirit of our institutions, and so far as our reports show has never been exercised in this state.

The reason for deeming it contrary to the spirit of our institutions that our courts should have the same power as their predecessors to defend themselves against abusive words, is not apparent. Only two arguments for withdrawing from them this authority can be imagined, one that abusive words have ceased to be regarded as a means of injury; the other, that such power could no longer be safely intrusted to the courts. But neither argument is well founded; for, by adopting the common law touching slander and libel, our forefathers unequivocally asserted their opinion that injury would still flow from unbridled tongues and pens, and by conceding to the courts the power of punishing contempts generally, they recognized the trustworthiness of the judiciary in vindicating, by summary process, their own authority and dignity. Why, then, should this single species of injury be taken from the category in which it has always stood? The importance of the "liberty of the press" is urged upon us. We do not underestimate it; but after all, the liberty of the press is only the liberty which every man has to utter his sentiments, and can be enjoyed only in subjection to that precept both of law and of morals: *sic utere tuo, ut alienum non lædas*. In a government where order is secured, not so much

by. force as by the respect which citizens entertain for the law and those charged with its administration, nothing which tends to preserve that respect from forfeiture on the one hand and detraction on the other, can be hostile to the common-wealth.

It is true, as stated, that there is not, in our reports, any instance of the exercise of the power to punish for mere words as a contempt; but this by no means indicates that the power has not been employed. The occasions on which it might properly be used are most likely to have arisen in those courts that try and decide causes in the immediate presence of inter-ested parties, and therefore under circumstances more calcu-lated to excite evil dispositions; and the proceedings of these courts are not reported, nor until the statute of 1884, under which the present appeal is taken, were they subject to review in courts whose decisions are reported. The authority of our superior tribunals over this class of contempts has never been questioned; and whenever it has been referred to in our reported cases, it has been either declared or assumed to remain with us in its original vigor. In *Flommerfelt* v. *Zellers*, 2 *Halst.* 31 (1823), counsel spoke of it as an undoubted power; in *State* v. *Doty*, 3 *Vroom* 403 (1868), Chief Justice Beasley mentions it as one repeatedly enforced; and in *Rhinehart* v. *Lance*, 14 *Vroom* 311 (1881), where Mr. Justice Depue discussed at large the subject "contempts," there is no intimation that this branch of judicial authority has been lopped off. In our judgment the power exists, notwithstanding the apparent infrequency of its exercise.*

Counsel further contends that the proceedings of the court below should be annulled because there does not seem to have been any affidavit of the facts as a foundation for the rule to show cause. This is not now a sufficient reason for reversal. No doubt the ordinary course of practice in such cases in courts of law is that an affidavit of the facts should first be presented; then, that a rule should be entered requiring the

---

*A large collection of cases on the subject "Contempt of Court" will be found in "The American Law Register," February to July, 1881.

In re Cheeseman.

alleged offender to show cause why he should not be attached for contempt; then, if good cause be not shown, that an attachment should issue, and the accused, on being brought in, should be either held to bail or committed to answer interrogatories; then, that interrogatories should be exhibited and answered; and thereupon, according as his answers confess or deny his guilt, he should be punished or discharged. But the practice has not been uniform. Sometimes a rule to show cause has been allowed without an affidavit, on a mere suggestion; sometimes an attachment has issued without a rule to show cause; sometimes punishment has been inflicted forthwith on the offender's confession when brought in by the writ, without interrogatories; and sometimes, as in *McQuade* v. *Emmons*, 9 *Vroom* 397, the penalty has been imposed on the offender's admissions made under the original rule, without either writ or interrogatories. So that these various steps are manifestly not jurisdictional, except to the extent of laying before the court matters which constitute a contempt, and affording to the party accused a fair opportunity of denying or confessing their truth. In the present case, the appellant, on the return of the rule to show cause, filed his affidavit declaring the truth of all the matters alleged in the rule as the basis for its allowance, and although the consideration of the cause was then adjourned from term to term, yet the appellant never intimated that an affidavit should have been presented before the rule was granted, or that he was entitled to have an attachment issue or interrogatories filed, or that the rule should be discharged for want thereof; and even after sentence was pronounced, he obtained leave to amend his affidavit, but did not complain of any irregularity or illegality in the proceedings. Under these circumstances the objection now made cannot be sustained.

Lastly, we are pressed with the impolicy of exercising the power to punish abusive publications as contempts.

We decline to weigh the *pro* and *con* of this argument, in performing our duty as an appellate tribunal. Although by the statute (*Pamph. L.* 1884, *p.* 219) we are to rehear the

Township of Wayne v. Cahill.

case of the appellant both upon the law and the facts, and to give such judgment as shall seem to be lawful and just, yet we are to do this in review of a judgment already rendered in the court below for the protection of its own dignity, peace and good order; and if in such judgment there is found, according to the law and the facts, nothing unlawful or unjust, it should be affirmed, whether in our individual opinions it was politic or impolitic to set the machinery of prosecution in motion.

We consider the judgment of the Oyer both legal and just, and therefore it is affirmed.